NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 240889-U

NOS. 4-24-0889, 4-24-0890, 4-24-0891 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 1, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.B., Je. B., and K.W., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
|      Petitioner-Appellee, | ) | Nos. 18JA206 |
|      v. | ) | 18JA207 |
| Mary W., | ) | 18JA208 |
|      Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | Dwayne A. Gab, |
| | ) | Judge Presiding. |

---

JUSTICE GRISCHOW delivered the judgment of the court.
Justices DeArmond and Vancil concurred in the judgment.

**ORDER**

¶ 1 *Held*: The appellate court affirmed, concluding the trial court's judgments finding respondent unfit and finding it in the best interest of two of the three minors for her parental rights to be terminated were not against the manifest weight of the evidence.

¶ 2 In January 2021, the State filed a petition to terminate the parental rights of respondent, Mary W., to her minor children, J.B. (born November 2008), Je. B. (born June 2011), and K.W. (born December 2013). The trial court found respondent unfit and determined it was in Je. B.'s and K.W.'s best interest, but not in J.B.'s, to terminate her parental rights. Respondent appeals, arguing the court's unfitness and best-interest findings were against the manifest weight of the evidence. We affirm.

¶ 3                                I. BACKGROUND

¶ 4                    A. The Wardship Petitions and Shelter Care Order

¶ 5        In September 2018, the State filed petitions seeking to adjudicate the minors abused and neglected under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.*) (West 2018)). The State alleged Je. B. and K.W. were abused in that they were forced by Gary W., K.W.'s father and respondent's paramour, to ingest cannabis (*id.* § 2-3(2)(i)). The State alleged J.B. was abused in that Gary's physical abuse of his siblings placed him at a substantial risk of physical injury (*id.* § 2-3(2)(ii)). The State also alleged the minors were neglected for being in an environment injurious to their welfare due to (1) their sibling ingesting cannabis in respondent and Gary's home and (2) Gary using drugs and residing in the home (*id.* § 2-3(1)(b)). Following a shelter care hearing, the trial court entered an order granting temporary guardianship and custody of the minors to the Illinois Department of Children and Family Services (DCFS).

¶ 6                    B. The Adjudicatory and Dispositional Orders

¶ 7        In November 2018, the trial court adjudicated the minors neglected pursuant to respondent's stipulation to the neglect petition. In December 2018, the court entered a dispositional order finding respondent unfit, unable, or unwilling, for reasons other than financial circumstances alone, to care for the minors, making them wards of the court, and placing their guardianship and custody with DCFS.

¶ 8                    C. The Termination Petitions

¶ 9        In January 2021, the State filed petitions to terminate respondent's parental rights to all three minors. The State alleged respondent was unfit for (1) failing to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) failing to make reasonable efforts to correct the conditions that were the basis for the

minors' removal during two nine-month periods following the adjudication of neglect, namely (a) November 14, 2018, to August 14, 2019, and (b) August 14, 2019, to May 14, 2020 (*id.* § 1(D)(m)(i)); and (3) failing to make reasonable progress toward the return of the minors during the same periods (*id.* § 1(D)(m)(ii)).

¶ 10                               D. The Fitness Hearing

¶ 11        The fitness hearing commenced on May 13, 2021, but did not conclude until July 28, 2022. At the beginning of the hearing, the trial court granted the State's motion to strike the grounds of the termination petition alleging respondent's unfitness for failing to make reasonable efforts or progress during the nine-month period spanning November 14, 2018, to August 14, 2019.

¶ 12                               1. *Danielle Croll*

¶ 13        Danielle Croll had been the minors' caseworker since September 2018. Croll determined which services would be appropriate for respondent based on the outcome of her integrated assessment. Croll's November 2018 integrated assessment recommended six services for respondent, namely (1) a substance abuse assessment, (2) individual counseling, (3) parenting classes, (4) domestic violence classes, (5) development of a support system, and (6) maintaining a relationship with the minors. The substance abuse assessment was recommended due to the reasons for the minors coming into care. Individual counseling was recommended because of respondent's "mental health at the time of the integrated assessment." Parenting classes were needed for respondent to develop appropriate parenting skills. Domestic violence classes were recommended because "[d]uring the integrated assessment[,] the [minors] reported witnessing multiple incidents of domestic violence." Croll noted respondent developed a support system and regularly engaged in her individual counseling from the beginning of the case until the date of the hearing. Respondent also engaged in parenting classes. Having been a victim of domestic violence,

respondent filed for an order of protection against Gary at the end of 2019 at the agency's recommendation. Respondent was attending domestic violence classes, but Croll believed that would "[n]ot necessarily" be a sufficient basis for returning the minors to her care. This was because "the agency would need to see [respondent] applying the skills that she learned in those services to real life situations."

¶ 14        Croll testified regarding an investigation involving K.W. commencing on January 13, 2020, following a "DCFS hotline call" made by personnel at K.W.'s school. They reported "that [K.W.] was crying in the bathroom because [Gary] had made her pinky promise to not say that he had seen her that weekend." Croll contacted respondent that evening. After finding respondent was not at home, she drove to Gary's house and found respondent's car in the back. Police arrived to accompany Croll into the house, and they found respondent, Gary, and Je. B. inside. Respondent and Je. B. then "took off out the back door toward her vehicle." Croll explained that Je. B. was not supposed to be at this residence because of the order of protection and because Gary was indicated for an accusation of sexually abusing Je. B. Croll believed that because respondent had a copy of the order of protection, she was aware Je. B. was not supposed to be in that residence. When Croll asked respondent to explain why she was there, respondent "stated that she felt tricked by her friend into going over there" and purportedly "did not know that [Gary] lived at that residence." Croll explained that before this incident, "[W]e were in the process of possibly returning the [minors] home." Indeed, Je. B. was "home with [respondent] full time." However, due to this incident, respondent's visitation was reduced to "supervised visits for two hours at a time in the office."

¶ 15        Croll met with respondent the following day to discuss how she managed the minors' behaviors. Respondent reported occasionally struggling with managing the minors'

behaviors during overnight and weekend visits. Respondent reported she would occasionally call Gary "to help discipline the [minors] via video chat." During a meeting in February 2020, the minors informed Croll that they had been to Gary's house and respondent would occasionally call Gary when they got in trouble.

¶ 16    Croll attended one of respondent's counseling sessions in May 2020 and confronted her about Je. B. being able to see messages exchanged on a tablet between respondent and Gary. Respondent denied having had any contact with Gary since the incident in January and claimed her Facebook account was hacked. Respondent did not express any intention to contact the police about her account being hacked, stating only that she would change her password and "block" Gary and the friend who she suspected of hacking into the account. After this conversation, Croll "kept getting reports of Facebook messages" between respondent and Gary. Respondent continued to deny having sent the messages and accused a friend of hacking into her Facebook account. Eventually, in mid-2020, she admitted to sending the messages. Respondent claimed she did not admit this before because "[s]he was afraid that it would affect getting her children back." In October 2020, Croll became aware of ongoing Facebook communications between respondent and Gary. When Croll confronted respondent about this, she denied having sent the messages and again stated her Facebook account had been hacked. Respondent stated she would change her password and block both Gary and the same friend she previously accused of hacking into her account. Respondent was aware that Je. B. was able to see these messages, but she did not express any concern for the effects this may have had on him.

¶ 17    On February 24, 2021, Croll attended another one of respondent's counseling sessions. During this session, respondent disclosed that "she realized that [Gary] was unsafe and she *** want[ed] to get divorced from him." During a session on March 24, 2021, respondent

disclosed a domestic violence incident, occurring before DCFS became involved with her family and witnessed by the minors, in which "Gary had beaten her so badly in the head that she thought she was going to die."

¶ 18　　　　Croll testified that she never felt comfortable returning the minors to respondent's care after January 2020 due to her allowing them around Gary, "the lack of parenting skills that the agency witnessed," and respondent's dishonesty. Even though respondent was "completely compliant with the services recommended," the agency was not comfortable with returning the minors because it was "unsure that she would be able to safely protect [them] especially from Gary at that point." Croll also testified regarding multiple reports of physical abuse in which Gary punched or hit the minors or beat them with sticks.

¶ 19　　　　On cross-examination, Croll acknowledged respondent was "cooperative" with her, had developed and maintained a support system, which included church and Primed for Life, and maintained a relationship with the minors. However, respondent did not rate as "satisfactory" on every service plan. In particular, she did not rate uniformly "satisfactory" on parenting classes "because of her parenting tactics that were observed during visits or also during her unsupervised time with the [minors]" and did not rate uniformly "satisfactory" on domestic violence classes "due to the continued relationship with [Gary]."

¶ 20　　　　　　　　　　　　　　2. *Respondent*

¶ 21　　　　Respondent testified that once she was given tasks by the agency to complete, she believed she was "following very well and doing everything they asked [her] to do." Respondent stated she separated from, and divorced, Gary at DCFS's instruction, and they have been separated ever since. Respondent claimed to have had no contact with Gary after obtaining the order of protection and denied contacting him on Facebook. Respondent alleged that her caseworker told

her outright that she knew respondent was having contact with Gary and did not believe her when she denied this. Respondent asserted her Facebook account had been hacked, requiring her to change her password "four or five times," whereupon "those messages stopped, and it seemed at that point there were no more problems."

¶ 22                          E. The Trial Court's Fitness Determination

¶ 23          On October 18, 2022, the trial court entered an order finding respondent unfit. The bases for the finding were failing to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare and for failing to make reasonable efforts to correct the conditions which were the basis for the removal of the minors during both nine-month periods alleged in the termination petitions. After noting the services recommended for respondent "were specifically tailored to address why the [minors] came into care as well as to address other safety concerns uncovered during the case," the court found respondent's claim of having been "tricked by a friend" into going to Gary's house "to be lacking in credibility." The court continued:

> "Of [ ] special importance to the Court is the testimony of [respondent] establishing a lack of insight and understanding that should have been present based upon the services she finished. While it is clear that [respondent] largely completed her services, it was also clear that she was aware of *** the need for the protection of [her minors], and yet she evidenced *** no understanding why the [minors] should not have contact with [Gary]. Contact that this Court finds directly harmful and disturbing to the [minors]. Contact that should have been prevented by [respondent] and should have been obviously harmful to the [minors] to her.

The main factual component of the case for the Court in regard to [respondent] is her inability to keep the children safe and away from [Gary] when in her care and if the children were returned to her. *** It is clear to the Court that she still does not understand the importance and necessity of not allowing contact with [Gary] until he deals with his substantial issues. This failure on the part of [respondent] also raises great concern with the Court in regards to the efficacy of the services [she] did complete."

¶ 24                    F. The Best-Interest Hearing

¶ 25        The best-interest hearing commenced on January 12, 2023, but it did not conclude until March 8, 2024.

¶ 26                    1. *Danielle Croll*

¶ 27        Croll was the minors' caseworker at Lutheran Child and Family Services until April 2022, whereupon she began working at Family Services Center.

¶ 28        J.B. had been in approximately five foster placements during Croll's time as the caseworker. Croll was aware that J.B.'s placement changed the week before the hearing. Croll explained that J.B. had "behavioral issues" throughout the life of the case, which were inhibiting permanency with a foster placement. On cross-examination, Croll acknowledged J.B. stated he wanted to live with respondent.

¶ 29        Je. B. had been in approximately 12 foster placements during Croll's time as the caseworker. Je. B. had been with his current foster father, Michael K., since February 2021. Michael was willing to adopt Je. B. and to maintain communication with respondent. Je. B. felt

safety and security with Michael, and Michael was providing for all his educational, social, and medical needs. On cross-examination, Croll acknowledged that Je. B. stated he wanted to live with respondent.

¶ 30        K.W. had been in two placements since the case began but had been in her current placement since November 2018. K.W. was living with two other foster children and her foster parents' three biological children. K.W.'s foster parents expressed a willingness to adopt K.W. if the permanency goal changed. While Croll was the caseworker, K.W.'s foster parents provided all her educational, social, and medical needs. Croll believed K.W. felt safety and security in her placement. K.W.'s foster parents were willing to maintain communication with respondent. On cross-examination, Croll admitted K.W. stated she wanted to live with respondent. Croll acknowledged that the minors and respondent maintained their bond and attachment throughout the termination proceedings. Nevertheless, Croll believed it to be in the minors' best interest to achieve permanency in their foster homes.

¶ 31                    2. *Patricia Dorsey*

¶ 32        Patricia Dorsey had been the minors' caseworker since beginning at Lutheran Child and Family Services in August 2022. K.W. and Je. B. had been in their placements this entire time. Michael was willing to provide permanency for Je. B. and was paying out of pocket for him to attend a private school and counseling. At the start of the hearing, J.B. and Je. B. were placed together with Michael. However, as of March 2024, Dorsey did not believe J.B. and Je. B. could be placed together due to J.B.'s alleged inappropriate behavior with Je. B. J. B. was now stable in a specialized foster home and not exhibiting any of the concerning behaviors that he was in previous placements. J.B.'s current foster mother was providing for all his educational and medical needs and was willing to provide permanency for J.B.

¶ 33    According to Dorsey, "both of the boys actually feel like it's their job to keep the family together." In fact, Je. B. told Dorsey and Michael that respondent talked with him about "writing a letter for best interest to help with getting [his siblings] and [her] back together." Je. B. "went from saying that he wanted to be adopted and he was really into *** starting his life with Michael *** to not being so sure because he thought he had a chance to move back home." Je. B. would say "maybe Gary is not so bad" and "[m]aybe we can help [respondent] protect us from Gary."

¶ 34    Dorsey initially testified that K.W.'s foster parents were willing to pursue long-term guardianship of K.W., not adopt her. However, Dorsey later clarified this was because of "some confusion" regarding the goal. K.W.'s foster parents were in fact willing to adopt her. K.W.'s foster parents were meeting all her medical and educational needs and had her enrolled in basketball and volleyball programs. K.W. wanted to be involved in the volleyball program because her older foster sister was. The agency felt K.W. was "doing great" in her foster home and should be adopted. K.W. stated "multiple times that she's ready to be adopted by this family. She wants to stay in contact with [respondent], but she wants to be adopted." K.W. called her foster parents "Papa Bear and Mama Bear," as well as "Papa Joe and Mama Amy." K.W. already had an outfit picked out for the day of her adoption and "knows where she's going to have her adoption meal," having "planned down to the T as to what's going to take place." When asked to describe the bond K.W. had with her foster siblings, Dorsey explained:

>    "She's very close with the littles. She does a lot for them.
>    She's like a little mom around them. She likes to keep—you know,
>    read to them, play with them. She has these guinea pigs on her land

that she takes care of and she's been teaching the little girl how to, like, hold them and be gentle with them and things like that.

So she takes pride in being a big sister to the little kids. But she looks up really well to the older kids, as well. She kind of does a lot they do."

¶ 35 Dorsey testified about an incident in December 2023, when K.W. "basically had a meltdown crying and telling the foster parents she had been holding a secret that [respondent] had told her to keep about where [Gary] was located and that she didn't feel comfortable keeping the secret any longer." Respondent told K.W. where Gary was living and that "at the next visit she would have an address as to where he was staying and not to tell anybody because she didn't want them to get into trouble." K.W. reported feeling sick, not being able to sleep, and feeling worried about how respondent would react to her having divulged this secret. Dorsey admonished respondent against having inappropriate conversations with the minors. At a subsequent visit, K.W. approached Dorsey "pretty much in tears" because Je. B. told her that respondent said K.W. "was the reason that they were not going to be able to return home or be able to visit with people because basically she told what was said in the visit." Despite their bond and attachment with respondent, Dorsey felt it was in the minors' best interest to achieve permanency in their current placements. All the minors' foster parents were willing to continue sibling visitation once the case closed.

¶ 36                                    3. *Respondent*

¶ 37 Respondent testified about staying home and caring for the minors and going on outings with them before they came into care. Respondent testified she is "very proud" of the minors. Respondent felt the services she engaged in made her a better mother and acknowledged

her need to "protect them from strangers and people they don't know." Respondent and Gary were divorced, and she had not had contact with Gary for four years. Respondent maintained her relationship with all the minors since they were taken from her custody. Respondent testified that all three minors stated they want to live with her and that this would be in their best interest.

¶ 38　　　　　　　　　　4. *The Trial Court's Best-Interest Determination*

¶ 39　　　　　On June 20, 2024, the trial court entered an order finding termination of respondent's parental rights to be in Je. B.'s and K.W.'s best interest, but not in J.B.'s. Based on the report from the guardian *ad litem* and Dorsey's testimony, J.B. "has not reached a significant level of bonding or permanency in his foster placements." Consequently, "the requisite degree of bonding and permanency necessary for the Court to find that the parental rights of [respondent] should be terminated have not been met." By contrast, Je. B. had achieved "substantial bonding" in his adoptive placement, which provided for his needs for permanency and safety, and K.W. was well cared for in her placement for the last five years and had developed strong attachments with her foster family. Thus, the court concluded, it was in their best interest for respondent's parental rights to be terminated.

¶ 40　　　　　This appeal followed.

¶ 41　　　　　　　　　　　　II. ANALYSIS

¶ 42　　　　　On appeal, respondent argues the trial court's unfitness and best-interest findings were against the manifest weight of the evidence.

¶ 43　　　　　　　　　　　A. Respondent's Brief

¶ 44　　　　　As an initial matter, we note the State has argued that respondent, who is represented by counsel, failed to comply with Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020) in that she did not include any details of the fitness hearing in her brief to this court, despite

the hearing occupying multiple days and comprising a substantial portion of the record in this appeal.

¶ 45 As the appellate court has cautioned, "[f]ailure to comply with the rules regarding appellate briefs is not an inconsequential matter." *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 7. "A brief that lacks any substantial conformity to the pertinent supreme court rules may justifiably be stricken." *Id.* In particular, "Rule 341(h)(6) requires a statement of facts that contains the facts 'necessary to an understanding of the case.' [Citation.]" *Id.* ¶ 9. "This court is *** within its rights to dismiss the appeal for failure to provide a complete statement of facts." *Id.* Here, the statement of facts in respondent's brief as it pertains to the unfitness finding (in contrast to the best-interest finding) is limited to an explanation of how the trial court found her unfit and contains no factual background regarding the evidence adduced at the hearing. We agree with the State that respondent's brief is deficient in this respect. Nonetheless, we are able to ascertain respondent's contentions on appeal and choose to address them on their merits. However, we caution respondent's counsel that any future violations of Rule 341 could result in her brief being stricken.

¶ 46 B. The Unfitness Finding

¶ 47 The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)) govern how the State may terminate parental rights. *In re D.F.*, 201 Ill. 2d 476, 494 (2002). Together, the statutes outline two necessary steps the State must take before terminating a person's parental rights—the State must first show by clear and convincing evidence the parent is an "unfit person," and then the State must show terminating parental rights serves the best interest of the child. *Id.* at 494-95.

- 13 -

¶ 48 This court notes respondent's counsel's concern about the unfitness finding for the removal from November 14, 2018, and August 2019, as the trial court granted the State's motion to strike the pertinent allegations from the termination petition. However, there were two other bases on which the trial court found respondent unfit. Despite several potential bases for unfitness, "sufficient evidence of one statutory ground *** [is] enough to support a [trial court's] finding that someone [is] an unfit person." (Internal quotation marks omitted.) *In re F.P.*, 2014 IL App (4th) 140360, ¶ 83.

¶ 49 The trial court found respondent unfit under two statutory grounds, including for failing to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare. The language used by our legislature in section 1(D)(b) of the Adoption Act is in the disjunctive, meaning that any one of the three elements—interest or concern or responsibility— "may be considered by itself as a basis for unfitness." *In re B'yata I.*, 2014 IL App (2d) 130558-B, ¶ 31 (citing 750 ILCS 50/1(D)(b) (West 2012)). The court must "examine[ ] the parent's conduct concerning the child in the context of the circumstances in which that conduct occurred." *Id.* (citing *In re Adoption of Syck*, 138 Ill. 2d 255, 278 (1990)). "We are mindful, however, that a parent is not fit merely because he or she has demonstrated some interest or affection toward the child." *Id.* (citing *In re Jaron Z.*, 348 Ill. App. 3d 239, 259 (2004)). Instead, the court must objectively assess whether the interest, concern, or responsibility is reasonable. *Id.* (citing *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)).

¶ 50 This court affords great deference to a trial court's fitness finding "because of [that court's] superior opportunity to observe the witnesses and evaluate their credibility." (Internal quotation marks omitted.) *In re A.L.*, 409 Ill. App. 3d 492, 500 (2011). We will not disturb a finding of unfitness unless it is against the manifest weight of the evidence. *In re J.H.*, 2020 IL App (4th)

200150, ¶ 68. "A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the [trial] court's finding on the basis of the evidence in the record [citation]." (Internal quotation marks omitted.) *Id.*

¶ 51        Here, the evidence established respondent failed to maintain a reasonable degree of responsibility as to the minors' welfare. Croll testified about respondent engaging in her required services, including parenting classes and domestic violence classes, and being overall cooperative with her during the case. However, despite engaging in those services, filing for an order of protection against Gary, and knowing Gary had been indicated for sexually abusing Je. B., respondent and Je. B. were still at Gary's house in January 2020. This incident resulted in the reduction of respondent's visitation. Thereafter, the minors disclosed to Croll that they had been to Gary's house and respondent would call him for help with discipline when they got in trouble. Later that year, respondent continued to inappropriately communicate with Gary, at first denying she was sending Facebook messages to him but eventually admitting she did. According to Croll, respondent initially denied sending the messages because she thought admitting to doing so would prevent the minors' return to her, thus illustrating her awareness of the impropriety of maintaining contact with Gary and the implications it potentially had for reunification with her children. Notably, all of this occurred after an incident (disclosed during counseling in March 2021) in which Gary had beaten respondent to the point that she feared for her life at his hands.

¶ 52        Despite respondent's compliance with the recommended services, cooperativeness with Croll, and obtaining an order of protection against Gary (and eventually a divorce), Croll never felt comfortable returning the minors to her care. This was due to respondent allowing the minors to be around Gary and her dishonesty regarding her and the minors' interactions with him.

In finding respondent unfit for failing to maintain a reasonable degree of interest, concern, or responsibility as to their welfare, the trial court emphasized that its primary consideration was respondent's demonstrated inability to keep the minors safe from Gary based on her failure to appreciate the importance and necessity of not allowing contact with him. We conclude this finding was not against the manifest weight of the evidence, as the evidence supports a finding that respondent failed to maintain a reasonable degree of responsibility as to the minors' welfare and does not clearly call for an opposite finding.

¶ 53                         C. The Best-Interest Finding

¶ 54          After a trial court finds a parent unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352 (2004). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* at 364. In making the best-interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of
> the child's identity; (3) the child's background and ties, including
> familial, cultural, and religious; (4) the child's sense of attachments,
> including love, security, familiarity, and continuity of affection, and
> the least-disruptive placement alternative; (5) the child's wishes;
> (6) the child's community ties; (7) the child's need for permanence,
> including the need for stability and continuity of relationships with
> parental figures and siblings; (8) the uniqueness of every family and
> child; (9) the risks related to substitute care; and (10) the preferences

of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005). "A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the [trial] court's finding on the basis of the evidence in the record [citation]." (Internal quotation marks omitted.) *J.H.*, 2020 IL App (4th) 200150, ¶ 68.

¶ 55 Here, the evidence established it was in Je. B.'s and K.W.'s best interest to terminate respondent's parental rights. Je. B. has been with Michael since February 2021, after approximately 11 previous placements. Michael was willing to adopt Je. B. and maintain lines of communication with respondent. Je. B. has felt safety and security with Michael, and Michael was providing for all his educational, social, and medical needs, including by paying out of pocket for Je. B. to attend private school and engage in counseling. While Croll testified that Je. B. had expressed a desire to live with respondent, Dorsey's testimony revealed that respondent coaxed him to write a letter in furtherance of her wish to have the minors returned to her. While Dorsey's testimony revealed a sense of hesitancy on Je. B.'s part about being adopted by Michael, this was because he felt "maybe Gary is not so bad" and perhaps he could help respondent in protecting himself and his siblings from Gary. This is reflective of Je. B.'s feeling that it is "[his] job to keep

the family together," undoubtedly resulting from respondent inappropriately and deceptively maintaining contact between the minors, herself, and Gary.

¶ 56        K.W. has been in her foster placement since November 2018, and her foster parents expressed a willingness to adopt her and maintain lines of communication with respondent. K.W. has felt safety and security with her foster parents, and they have been providing for all her educational, social, and medical needs. K.W.'s foster parents enrolled her in basketball and volleyball programs, the latter specifically because of her desire to participate in a sports activity with her older foster sister. Dorsey testified about the very close bond K.W. has established with her foster siblings. K.W. stated "multiple times that she's ready to be adopted by this family," calls her foster parents "Papa Bear and Mama Bear," as well as "Papa Joe and Mama Amy," and has "planned down to the T as to what's going to take place" on the day of her adoption. While Croll testified that K.W. stated she wanted to live with respondent, Dorsey's testimony established that respondent recruited K.W. into covering for her ongoing, improper relationship with Gary by demanding K.W.'s silence when telling her of Gary's whereabouts. Dorsey also testified about Je. B. blaming K.W. for not being able to go home to respondent after K.W. divulged this information and becoming physically ill from the stress of keeping it hidden at respondent's insistence.

¶ 57        The evidence established that Je. B. and K.W. have maintained a bond with respondent throughout the termination proceedings. Indeed, respondent testified she has maintained her relationship with all the minors since they were taken from her custody, that all three minors have stated they want to live with her, and that this would be in their best interest. However, "[f]ollowing a finding of unfitness *** the focus shifts to the child. The issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs,

parental rights *should* be terminated." (Emphases in original.) *D.T.*, 212 Ill. 2d at 364. The law is clear that the existence of a parent-child bond "does not automatically insure that *** the child's best interests will be served by that parent." *In re J.B.*, 198 Ill. App. 3d 495, 499 (1990). The trial court's finding termination of respondent's parental rights was in Je. B.'s and K.W.'s best interest was well-supported by the record. We conclude the trial court's best-interest finding was not against the manifest weight of the evidence, as we cannot say that the evidence adduced clearly calls for the opposite conclusion.

¶ 58                                    III. CONCLUSION

¶ 59            For the reasons stated, we affirm the trial court's judgment.

¶ 60            Affirmed.